UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

MALKA KUMER; CHANA LIBA KUMER; MIRIAM
ALMACKIES; CHAIM KAPLAN; RIVKA KAPLAN;
BRIAN ERDSTEIN; KARENE ERDSTEIN; MA'AYAN
ERDSTEIN; CHAYIM KUMER; NECHAMA KUMER;
LAURIE RAPPEPORT; MARGALIT RAPPEPORT;
THEODORE (TED) GREENBERG; MOREEN
GREENBERG; JARED SAUTER; DVORA CHANA
KASZEMACHER; CHAYA KASZEMACHER
ALKAREIF; AVISHAI REUVANE; ELISHEVA ARON,
YAIR MOR; and MIKIMI STEINBERG,

                              Plaintiffs,

                         -against-

BANK SADERAT IRAN; and BANK SADERAT, PLC,

                              Defendants.

-------------------------------------------------------------------X

Case No.

**COMPLAINT**

Jury trial demanded

## COMPLAINT

Plaintiffs, by their counsel, complain of the Defendants, and hereby allege for their Complaint as follows:

## INTRODUCTION

1.      This is a civil action pursuant to the Antiterrorism Act ("ATA"), 18 U.S.C. § 2333(a), brought by American citizens harmed by or as the result of rockets and missiles fired by the Hezbollah terrorist organization at civilians in Israel, between July 12 and August 14, 2006 (hereinafter: the "Hezbollah Rocket Barrage").

2.     Defendants Bank Saderat Iran and Bank Saderat PLC provided extensive material support and resources to Hezbollah, that caused, enabled and facilitated the Hezbollah Rocket Barrage, and harmed the plaintiffs herein. Specifically, as found by the U.S. Department of the Treasury, "from 2001 and 2006, Bank Saderat Iran transferred $50 million from the Central Bank of Iran through its subsidiary in London [Bank Saderat, PLC] to its branch in Beirut for the benefit of Hezbollah fronts in Lebanon that support acts of violence."

## THE PARTIES

3.     The plaintiffs are all U.S. citizens and civilians who were harmed by or as the result of rocket and missile attacks on northern Israel carried out by defendant Hezbollah between July 12 and August 14, 2006. The details of the attacks and of plaintiffs' harm are set forth below.

4.     Defendant Bank Saderat Iran ("BSI") is a bank incorporated in the Islamic Republic of Iran ("Iran") and one of Iran's largest banks with approximately 3,400 offices worldwide. BSI was nationalized in 1979 after the Iranian Revolution. In 2006, at the time of the Hezbollah Rocket Barrage that is the subject of this action, BSI was wholly owned and controlled by the Iranian government. In fact, BSI continued to be owned and controlled by the government of Iran until as late as 2010, as confirmed by the United States Department of the Treasury in an August 3, 2010 Press Release. BSI has been operating in Lebanon since 1963 and, according to its website, at all relevant times had five branches and a regional office there. At all relevant times it was the only Iranian-owned bank in Lebanon. BSI's Beirut branch is known for handling large cash transfers from Iran rather than standard banking such as corporate lending.

5.     Defendant BSI is and was at all relevant times an agent of Iran. Defendant BSI, acting within the scope of its office and agency, along with defendant Bank Saderat PLC,

provided Hezbollah with material support and resources that enabled, facilitated and caused the Hezbollah Rocket Barrage and harmed the plaintiffs herein.

6.     Defendant Bank Saderat PLC ("BSPLC") is a bank incorporated in the United Kingdom that is wholly-owned by defendant BSI. Defendant BSPLC, along with defendant BSI, provided Hezbollah with material support and resources that enabled, facilitated and caused the Hezbollah Rocket Barrage and harmed the plaintiffs herein.

## SUBJECT MATTER JURISDICTION

7.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and pursuant to 18 U.S.C § 2333(a).

## PERSONAL JURISDICTION

8.     This Court has personal jurisdiction over the defendants because, as explained and elaborated upon herein, their actions caused, enabled and facilitated the Hezbollah Rocket Barrage, and those same actions were intentionally directed by defendants at the United States, intended by defendants to harm the United States, and did in fact cause harm to the United States.

9.     In addition, the $50 million in U.S. Dollar denominated currency which the defendants transferred to Hezbollah in the years immediately prior to the Hezbollah Rocket Barrage, is part of the Eurodollar market (discussed in greater detail below) and some or all of the transfers were processed through the United States.

## STATEMENT OF FACTS

### A.     The Islamic Republic of Iran

10.     Since 1979 and during the period relevant to this suit, Iran has continuously been governed by a militant Islamic regime which believes that Islam should be the sole world

religion, that all non-Islamic nations and peoples should become Islamic and be destroyed if they refuse to do so, and that the Islamic nations, led by Iran, should rule the world exclusively.

11.     Since 1979 and during the period relevant to this suit Iran has been and remains, as a matter of official policy, extremely hostile to the United States (which Iran terms "the Great Satan") and to its closest ally in the Middle East, the State of Israel (which Iran terms "the Little Satan").

12.     Since 1979 and during the period relevant to this suit it has been the continuous and official policy and goal of Iran:

a)  To weaken, harm and undermine the United States militarily, economically and politically;

b)  To bring about and cause the eradication of the State of Israel, the closest ally of the United States in the Middle East, and its replacement with an Islamic state; and

c)  To bring about and cause the murder and/or expulsion of the Jewish residents of the State of Israel.

13.     The policy and goals described in the previous paragraph are referred to collectively hereinafter as "Iran's Policy and Goals."

14.     Iran is a highly ideological and authoritarian state that does not tolerate dissent and all political subdivisions of the Iranian government, all agencies and instrumentalities of Iran and all corporations controlled or directly or indirectly owned by Iran therefore support, and seek to advance the policies and goals of Iran, including Iran's Policy and Goals. Accordingly, the Central Bank of Iran ("CBI") (which is a political subdivision of Iran), BSI (which is an agent of Iran and, at all relevant times is and was controlled and directly owned by Iran), and BSPLC

(which is controlled and indirectly owned by Iran as a wholly owned subsidiary of BSI) support and seek to advance Iran's Policy and Goals.

15.     Since 1979 and during the period relevant to this suit, it has been the continuous and official policy of Iran to use terrorism to achieve Iran's Policy and Goals. Specifically, since 1979 and during the period relevant to this suit, it has been the continuous and official policy of Iran to use terrorism (a) to intimidate and influence the United States government and public and thereby to weaken, harm and undermine the United States militarily, economically and politically and (b) to intimidate and influence the Israeli government and public and thereby to bring about the eventual eradication of the State of Israel and its replacement with an Islamic state and the murder and/or expulsion of the Jewish residents of the State of Israel.

16.     In order to carry out and achieve Iran's Policy and Goals using terrorism, Iran established the Hezbollah terrorist organization in 1982. Since 1982 and until the present day, Hezbollah has been controlled, funded and operated by Iran. Since 1982 and until the present day, Iran has used Hezbollah to carry out thousands of terrorist attacks against American and Israeli targets, in which hundreds of innocent victims have been murdered and thousands more maimed.

17.     In 1982 Iran and Hezbollah entered into an agreement, that remains in force until today, pursuant to which Hezbollah undertook to carry out acts of terrorism against American and Israeli targets, and in return Iran undertook to provide Hezbollah with financial and other material support to carry out such terrorist attacks ("Hezbollah Agreement"), including through defendants BSI and BSPLC. The purpose of the Hezbollah Agreement was and is to achieve Iran's Policy and Goals.

18.     The United States designated Iran a State Sponsor of Terrorism on January 19, 1984, pursuant to § 6(j) of the Export Administration Act, § 40 of the Arms Export Control Act, and § 620A of the Foreign Assistance Act. Since that time and as a result of that designation, Iran developed ways to circumvent U.S. economic sanctions levied against the regime and to facilitate the free movement of U.S. dollars that Iran obtained (largely from the sale of petroleum and natural gas) without detection by the U.S. government in order to pursue foreseeably illicit objectives, including transferring $50 million USD to Hezbollah between 2001 and 2006, as detailed herein.

19.     The courts of the United States have issued many decisions finding Iran civilly liable for terrorist attacks carried out by Hezbollah in which U.S. citizens were murdered or harmed. The District Court for the District of Columbia has found that "Hezbollah is an Iranian proxy organization, controlled, funded and operated by Iran … Iran's control over Hezbollah is so far-reaching that [the federal courts have] repeatedly held Iran vicariously liable, under the doctrine of respondeat superior, for actions of Hezbollah." *Stern v. Islamic Republic of Iran*, 271 F.Supp.2d 286, 292 (D.D.C. 2003). Moreover, the District Court for the District of Columbia found that Iran is liable under FSIA § 1605A for the very same Hezbollah Rocket Barrage that is at issue here. *See Kaplan v. Central Bank of Iran*, 55 F. Supp. 3d 189, 197 (D.D.C. 2014) ("With respect to the rocket attacks, the Court finds that Iran assisted Hezbollah … most generally by providing the funds for the assistance…").

**B.      Hezbollah**

20.     The terrorist attacks committed by Hezbollah against the United States, Israel, and others, between 1982 and July 12, 2006, using material support and resources provided by Iran, included, *inter alia*, the following:

a. The July 19, 1982, kidnapping of American University president David S. Dodge in Beirut.

b. The April 18, 1983, car bomb attack on the United States Embassy in Beirut in which 63 people were killed.

f. The October 23, 1983, truck bomb attack on the U.S. Marine barracks in Beirut in which 241 American military personnel were killed.

g. The September 20, 1984, car bomb attack on the U.S. Embassy annex in Beirut in which two Americans and 22 others were killed.

h. The March 16, 1984, kidnapping and murder of William Buckley, a CIA operative working at the U.S. Embassy in Beirut.

i. The April 12, 1984, attack on a restaurant near the U.S. Air Force Base in Torrejon, Spain in which eighteen U.S. servicemen were killed and 83 people injured.

j. The December 4, 1984, terrorist hijacking of a Kuwait Airlines plane in which four passengers were murdered, including two Americans.

k. The June 14, 1985, hijacking of TWA Flight 847 in which Robert Stethem, a U.S. Navy diver, was murdered. Other American passengers were held hostage before being released on June 30, 1985.

l. The February 17, 1988, kidnapping and subsequent murder of U.S. Marine Col. William Higgins.

m. The March 17, 1992, bombing of the Israeli Embassy in Buenos Aires that killed 29 people and injured over 200.

n. The July 18, 1994, bombing of the Jewish community center in Buenos Aires that killed 86 people and injured over 200.

o. The November 28, 1995, bombardment of towns in northern Israel with missiles aimed at Jewish civilians.

p. The March 30, 1996, bombardment of northern Israeli towns with 28 missiles. A week later, Hezbollah fired 16 additional missiles, injuring 36 Israelis.

q. The August 19, 1997, bombardment of northern Israel with dozens of missiles aimed at Jewish civilians.

r. The December 28, 1998, bombardment on northern Israel with dozens of missiles aimed at Jewish civilians.

s. The May 17, 1999 bombardment on northern Israel with dozens of missiles aimed at Jewish civilians.

t. The June 24, 1999, bombardment on northern Israel, killing 2 people.

u. The April 9, 2002, launching of missiles into northern Israeli towns.

v. The August 10, 2003, firing of shells that killed a 16-year-old Israeli boy and wounded other Israelis.

31. Hezbollah has been designated by the United States Government as a Specially Designated Terrorist ("SDT") continuously since 1995, as a Foreign Terrorist Organization ("FTO") continuously since 1997, and as a Specially Designated Global Terrorist ("SDGT") continuously since 2001.

32. Hezbollah routinely operates within civilian populations, using civilians as human shields and/or deliberately targeting civilians.

33.     Support for Hezbollah, even in the form of funds transfers, "has no legitimate function that the United States recognizes." *Lelchook v. Commerzbank AG*, 2011 WL 4087448 (S.D.N.Y. 2011).

### C.     Iran's Use of Defendant Banks to Further its Policy and Goals

34.     In order to carry out and achieve Iran's Policy and Goals, Iran utilizes its government owned or controlled banks, including defendants BSI and BSPLC, to provide necessary financing for its terrorist proxies, including Hezbollah.

35.     BSI (along with all other Iranian banks) was nationalized and placed under the control of the Iranian government in 1979 pursuant to the Iranian Revolutionary Constitution of 1979. As confirmed by BSI's own Chairman in BSI's 2009-10 Annual Report, "[a]fter banks were nationalized, *their policy making system was assigned to the government* and banks had little authority over decision-making." (emphasis added).

36.     As the U.S. State Department correctly explained, the Iranian Revolutionary Constitution "established a theocratic republic and declared as its purpose *the establishment of institutions* and a society *based on Islamic principles* and norms." (emphasis added). The U.S. State Department further noted the fact that the Iranian "Constitution *mandates* that all largescale industry, *including … banking* … be *owned publicly* and *administered by the state*." (emphasis added).

37.     In this regard, CBI admits on its website that "After the Islamic Revolution of Iran laws and regulations pertaining to money and banking institutions and monetary policy design and implementation were amended *to reflect the priorities and principles as set out in the Constitution of the Islamic Republic of Iran*." (emphasis added).

38.     The Iranian constitutional "priorities and principles" which govern and guide the conduct of BSI and BSPLC include, promoting and protecting the sanctity of Islam worldwide, ensuring the continuation of the Islamic Revolution *at home and abroad* with the goal of creating a single world community under Islam, rejecting any alignment with "the hegemonist superpowers," and supporting the "just struggles" of the "oppressed" against "tyrants" in "every corner of the globe."

39.     The Iranian constitutional "priorities and principles" which guide and govern the conduct of BSI and BSPLC also include Iran's Policy and Goals, and the use and support of terrorism to achieve Iran's Policy and Goals.

40.     CBI does not function in the same manner as central banks in democratic countries that are institutionally designed to be independent from political interference nor is its purpose limited to "regulating" Iranian banks and managing Iran's currency and internal interest rates. Instead, CBI is an alter-ego and instrumentality of the Iranian government which operates in accordance with the "priorities and principles" of the Iranian constitution.

41.     As the Research Division of the Library of Congress has correctly noted: "All [Iranian] state and private banks are *strictly overseen* by the Central Bank of Iran."

42.     The ideological mandate and role of CBI, BSI and BSPLC was confirmed by then-President Mahmoud Ahmadinejad in a December 2005 speech at CBI's headquarters in which he stated that the "glory, identity, independence and future progress of the country is greatly dependent on" Iran's banks, emphasizing that the "glory" and "identity" referred to the ideals of the Islamic Revolution.

43.     Accordingly, CBI assists the Iranian government to ensure that BSI and BSPLC adopt, follow and execute the Iranian government's "priorities and principles," and work towards

the regime's Policy and Goals described above, which include the provision of banking services to Iran's proxy Hezbollah and other terrorist groups.

44.     Consistent with this, Iran has routinely used Iranian Banks, including BSI and BSPLC as conduits to finance Hezbollah. In July 2007, U.S. Undersecretary of the Treasury for Terrorism and Financial Intelligence Stuart Levey correctly explained that:

> The [Iranian] regime does use its banks to pursue … its funding of terrorism … we in the United States have taken action against Bank Saderat for its role in funneling money *from the Central Bank of Iran* to terrorist organizations [including] Hezbollah … Iran not only uses its banks for that purpose, but also *its banks engage in deceptive practices in order to engage in that business.* (emphasis added).

45.     Levey similarly testified before Congress in 2008, accurately stating that "Iran uses its state-owned banks … for financing terrorism."

46.     The fact that BSI and BSPLC transferred funds to Hezbollah pursuant to the Policy and Goals of the Iranian government—and in order to realize those goals—is also confirmed in a November 2008 Press Release issued by the United States Department of Treasury, which explained that:

> Iran Uses its Banks to Finance Terrorism.  In a number of cases, Iran has used its state-owned banks to channel funds to terrorist organizations. Between 2001 and 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through Bank Saderat's subsidiary in London to its branch in Beirut for the benefit of Hizballah fronts that support acts of violence.

47.     The Department of Treasury has made similar statements in a number of Press Releases since September 2006. In one such Press Release, dated October 2007, the Treasury Department specifically addressed BSI and BSPLC, summarizing the facts that:

> Bank Saderat, its branches, and subsidiaries: Bank Saderat, which has approximately 3200 branch offices, has been used by the Government

of Iran to channel funds to terrorist organizations, including Hezbollah and EU-designated terrorist groups Hamas, PFLP-GC, and Palestinian Islamic Jihad. For example, from 2001 to 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London [*i.e.*, BSPLC] to its branch in Beirut for the benefit of Hezbollah fronts in Lebanon that support acts of violence.

48.     The threat of Iranian-sponsored terrorism to the United States and the importance of the role played by defendants BSI and BSPLC in assisting Iran to provide financial support for that terrorism was confirmed, *inter alia*, by Pat O'Brien, Assistant Secretary in the Office of Terrorist Financing and Financial Crimes of the U.S. Department of the Treasury, who testified before the Senate Committee on Banking, Housing, and Urban Affairs on June 22, 2006. Assistant Secretary O'Brien noted the Executive Branch's intention to "draw on all instruments of national power to combat **the very real threat posed by Iran's sponsorship of terrorism**" and accurately explained that:

> At Treasury, we are focused on the support networks, trying to identify and sever the lines of support that fuel terrorist activities. ***Stopping the money flows is particularly challenging in this instance, as Iran draws upon a large network of state-owned banks***. (emphasis added)

49.     The U.S. Treasury's Financial Crimes Enforcement Network (FinCEN) has confirmed that the conspiracy and joint-action between Iran, CBI, BSI and BSPLC to provide funding for Hezbollah and other terrorist groups, which has been on-going for decades, was still continuing in full force as of 2008. In a 2008 Advisory, FinCEN correctly noted "the Government of Iran's continued attempts to conduct… terrorist financing." As FinCEN accurately explained: "Through state-owned banks, the Government of Iran disguises its involvement in … terrorism activities through an array of deceptive practices specifically designed to evade detection. The Central Bank of Iran and Iranian commercial banks have

requested that their names be removed from global transactions in order to make it more difficult for intermediary financial institutions to determine the true parties in the transaction. … The U.S. Department of the Treasury is particularly concerned that the Central Bank of Iran may be facilitating transactions for sanctioned Iranian banks."

50.     Iran's use of its state owned or controlled banks to carry out its constitutional "priorities and principles," which include Iran's Policy and Goals, by, *inter alia*, using its banks to finance terrorism, has resulted in those banks, including defendants BSI and BSPLC, being subjected to sanctions by the United States government.

51.     Specifically, with respect to BSI and BSPLC, on September 8, 2006, the U.S. Office of Foreign Asset Control ("OFAC") amended § 560.516 of the Iranian Trade Regulations to exclude BSI and BSPLC from the Iranian "U-Turn exemption." The U-Turn exemption allowed Iranian parties, including BSI and BSPLC, indirect access to U.S. dollars, *provided* such payments were initiated offshore by a *non-Iranian*, non-U.S. financial institution and only passed through the U.S. financial system *en route* to another offshore, *non-Iranian*, non-U.S. financial institution; *and* provided that none of the parties to the transactions had been designated an SDN, or that the transaction was for an SDN's benefit.

52.     In announcing the change with respect to BSI (and BSPLC), OFAC stated: "OFAC has amended the Iranian Transactions Regulations (ITR) to cut off Bank Saderat, one of Iran's largest government-owned banks, from the U.S. financial system. Bank Saderat has been a significant facilitator of Hezbollah's financial activities and has served as a conduit between the Government of Iran and Hezbollah."

53.     According to then-Under Secretary for Terrorism and Financial Intelligence Stuart Levey, "Bank Saderat facilitates Iran's transfer of hundreds of millions of dollars to

Hezbollah and other terrorist organizations each year. We will no longer allow a bank like Saderat to do business in the American financial system, *even indirectly*." (emphasis added).

54.     Undersecretary Levey further explained that BSI "is used by the Government of Iran to transfer money to terrorist organizations. Iran uses Saderat to transfer money to Hizballah."

55.     One year later, on October 25, 2007, exercising his powers pursuant to the International Emergency Economic Powers Act ("IEEPA"), then-President Bush (and the U.S. Treasury Department) designated BSI (including BSPLC) a Specially Designated Global Terrorist pursuant to Executive Order 13224. The language of Executive Order 13224 refers to "grave acts of terrorism . . . and the continuing and immediate threat of further attacks on United States nationals or the United States," which "constitute *an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States* . . ." (emphasis added). The IEEPA itself provides that it grants the President authority to regulate commerce after declaring a national emergency in response to "*any unusual and extraordinary threat*, which has its source in whole or substantial part outside the United States, *to the national security, foreign policy, or economy of the United States*." (emphasis added).

56.     These sanctions resulted in economic harm and commercial losses for BSI and BSPLC. Specifically, the sanctions caused international financial institutions to reexamine their correspondent banking relationship with BSI and BSPLC. BSI itself issued a statement complaining about the impact of the sanctions on its international business and the *New York Times* reported on November 2, 2008 that the designated Iranian banks were "losing customers and struggling to find new banking relationships."

57.     Thus, BSI and BSPLC act to fulfill Iran's Policy and Goals, including the provision of material support and resources to Hezbollah, even when it is against their commercial interests.

**D.     The Defendants' Provision of Funding to Hezbollah Between 2001 and 2006**

58.     Hezbollah requires financial support in order to: (a) build and maintain its operational infrastructure for the planning and execution of terrorist attacks; (b) purchase and store weapons, explosives and other materiel used by it to carry out terrorist attacks; (c) in order to pay, train, transport and shelter its terrorist operatives; and (d) carry out specific terrorist attacks.

59.     Between 2001 and 2006, as part of their campaign to carry out Iran's Policy and Goals, the defendants herein provided Hezbollah with over $50 million in USD financial support (hereinafter: "Defendants' Transfer of Funds to Hezbollah") with the specific intent and purpose of facilitating, enabling and causing Hezbollah to carry out terrorist attacks against American and Israeli targets in order to advance Iran's Policy and Goals.

60.     Defendants' Transfer of Funds to Hezbollah was carried out by defendants with the specific intent and purpose of (a) intimidating and influencing the United States government and public and thereby weakening, harming and undermining the United States militarily, economically and politically and (b) intimidating and influencing the Israeli government and public and thereby bringing about the eventual eradication of the State of Israel and its replacement with an Islamic state and the murder and/or expulsion of the Jewish residents of the State of Israel.

61.     Defendants' Transfer of Funds to Hezbollah was carried out by defendants in the following manner: CBI transferred U.S. Dollar denominated funds belonging to Iran to defendant

BSI; defendant BSI then transferred these funds to defendant BSPLC in London; defendant

BSPLC then transferred these funds to accounts controlled by Hezbollah in branches of

defendant BSI in Beirut, from which Hezbollah received these funds.

62.    Defendants' Transfer of funds to Hezbollah has been confirmed by the United

States government. An October 2007 Press Release issued by the United States Department of

Treasury explained the fact that Iran transferred the funds from CBI through defendants BSI and

BSPLC to Hezbollah:

> Bank Saderat, its branches, and subsidiaries: Bank Saderat, which has
> approximately 3200 branch offices, has been used by the Government
> of Iran to channel funds to terrorist organizations, including Hezbollah
> and EU-designated terrorist groups Hamas, PFLP-GC, and Palestinian
> Islamic Jihad. For example, from 2001 to 2006, Bank Saderat
> transferred $50 million from the Central Bank of Iran through its
> subsidiary in London [*i.e.*, BSPLC] to its branch in Beirut for the
> benefit of Hezbollah fronts in Lebanon that support acts of violence.[1]

63.    The Department of Treasury reiterated these facts in a November 2008 Press

Release, correctly stating that:

> Iran Uses its Banks to Finance Terrorism.  In a number of cases, Iran
> has used its state-owned banks to channel funds to terrorist
> organizations.  Between 2001 and 2006, Bank Saderat transferred $50
> million from the Central Bank of Iran through Bank Saderat's
> subsidiary in London to its branch in Beirut for the benefit of
> Hizballah fronts that support acts of violence.

64.    These transfers, which facilitated and caused the Hezbollah Rocket Barrage that

harmed the plaintiffs, also harmed the United States. As explained above, the decision of the

U.S. government to subject BSI and BSPLC to financial sanctions pursuant to Executive Order

---

[1] At least one news publication indicated that in 2006 alone, Hezbollah received $400 million
in assistance from Iran through BSI and the Iranian embassy in Beirut.

13224 and the IEEPA as a result of the transfers means that the U.S. considers the conduct that led to the sanctions to be harmful "to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701. Thus, it is clear that the transfers were intended to, and did, harm the interests of the United States.

65.     Here, the transfers increased Hezbollah's military capabilities to carry out terrorist attacks around the world of which the U.S. had been a primary target since Hezbollah's inception.

66.     But for Defendants' Transfer of Funds to Hezbollah, Hezbollah's ability (a) to build and maintain its operational infrastructure for the planning and execution of terrorist attacks; (b) to purchase and store weapons, explosives and other materiel used by it to carry out terrorist attacks; (c) to pay, train, transport and shelter its terrorist operatives; and (d) to carry out specific terrorist attacks, including the Hezbollah Rocket Barrage and that harmed the plaintiffs herein, would have been severely crippled and limited.

67.     Defendants' Transfer of Funds to Hezbollah substantially increased Hezbollah's ability to plan and carry out terrorist attacks in furtherance of Iran's Policy and Goals, and facilitated and caused the execution of terrorist attacks by Hezbollah, including the Hezbollah Rocket Barrage that harmed the plaintiffs herein.

68.     Indeed, these transfers which facilitated the Hezbollah Rocket Barrage were also part of the financial flows that enabled Hezbollah to increase its attacks on U.S. soldiers in Iraq at the time.

69.     The defendants gave substantial aid, assistance and encouragement to one another and to Hezbollah and provided massive financial support to Hezbollah, and thereby aided and abetted Hezbollah, all with the specific intention of causing and facilitating the commission of

acts of extrajudicial killing and international terrorism by Hezbollah in furtherance of Iran's Policy and Goals, including the Hezbollah Rocket Barrage that harmed the plaintiffs herein. The defendants did so with actual knowledge that Hezbollah had killed and injured numerous U.S. and other civilians in terrorist attacks and with the knowledge and specific intent that additional U.S. and other innocent civilians would be killed and/or injured as a result of their aiding, abetting and provision of material support and resources to the Hezbollah.

70.     The defendants knowingly and willingly conspired, agreed and acted in concert with one another and with Hezbollah and Iran, in order to advance Iran's Policy and Goals and pursuant to the Hezbollah Agreement, to cause and facilitate the commission of acts of extrajudicial killing and international terrorism including the Hezbollah Rocket Barrage that harmed the plaintiffs herein. The defendants did so with actual knowledge that Hezbollah had killed and injured numerous U.S. and other civilians in terrorist attacks and with the knowledge and specific intent that additional U.S. and other innocent civilians would be killed and/or injured as a result of their conspiracy with Hezbollah.

71.     At all relevant times, BSI was an agent of Iran, and performed acts on behalf and at the direction of Iran, in order to advance Iran's Policy and Goals, pursuant to the Hezbollah Agreement and within the scope of its agency and office that caused the Hezbollah Rocket Barrage and harmed the plaintiffs herein, in that BSI implemented and acted as a conduit and instrumentality for Iran's provision of funds to Hezbollah for the commission of acts of extrajudicial killing and international terrorism including the Hezbollah Rocket Barrage, as described herein.

72.     Iran ordered, directed, authorized, ratified and approved the acts of BSI. At all relevant times, BSPLC was an agent of Iran, and performed acts on behalf and at the direction of

Iran, in order to advance Iran's Policy and Goals, pursuant to the Hezbollah Agreement and within the scope of its agency, that caused the Hezbollah Rocket Barrage and harmed the plaintiffs herein, in that BSI implemented and acted as a conduit and instrumentality for Iran's provision of funds to Hezbollah for the commission of acts of extrajudicial killing and international terrorism including the Hezbollah Rocket Barrage, as described herein.

73.     Iran ordered, directed, authorized, ratified and approved the acts of BSPLC.

**E.     The $50 Million was Part of the Eurodollar Market and Some or all of it Passed Through the United States**

74.     Iran has been subjected to economic sanctions of some form or another continuously since at least 1984. Over the years, the U.S. has tightened these economic sanctions.

75.     In 1996, in response to the June 25, 1996 truck bombing of the Khobar Towers in Saudi Arabia, Congress passed the 1996 Iran-Libya Sanctions Act, finding that:

> (1)   The efforts of the Government of Iran to acquire weapons of mass destruction and the means to deliver them ***and its support of acts of international terrorism*** endanger the national security and foreign policy interests of the United States and those countries with which the United States shares common strategic and foreign policy objectives.

> (2)   The objective of preventing the proliferation of weapons of mass destruction and ***acts of international terrorism*** through existing multilateral and bilateral initiatives ***requires additional efforts to deny Iran the financial means*** to sustain its nuclear, chemical, biological, and missile weapons programs. (Emphasis added.)

76.     To ensure that U.S. financial institutions that process international wire transfers in the Eurodollar market do not assist Iran in its support of international terrorism and weapons proliferation or facilitate other prohibited transactions, U.S. financial institutions have been (and

are) required to use sophisticated computer systems and software algorithms to monitor and screen all wire transfer activities.

77.     Banks in New York that process most of the world's USD Eurodollar payments and foreign exchange transactions depend on these automated systems to prevent Iran and other sanctioned entities (as well as terrorists, money launderers, and other criminals) from gaining access to the United States banking system. In this way, U.S. financial institutions are supposed to be the first line of defense to prevent Iran from accessing the U.S. financial system to fund or otherwise engage in terrorism and other prohibited conduct.

78.     At the same time, because, on average, 60 percent of Iranian government revenues and 90 percent of Iran's export revenues originate from the sale of its oil and gas resources, a market largely denominated in USD (known as "petrodollars"[2]), and because Iran's currency, the Rial, was (in part due to U.S. sanctions) one of the world's least valued currencies, the Iranian regime was desperately dependent on access to the USD funds it maintained in the Eurodollar market, and the interest income these petrodollar deposits generated.[3]

79.     Thus, reliably consistent access to, and the ability to facilitate trade in, the Eurodollar market has been critical to the capacity of the Iranian regime to fund its terror proxies such as Hezbollah in Lebanon, which it did with the assistance of financial institutions, such as BSI and BSPLC, that had access to the Eurodollar market through correspondent banking relationships during the relevant time.

---

[2] The petrodollar market developed because, *inter alia*, the United States was the largest producer and consumer of oil in the world; the world oil market has been priced in USD since the end of World War II.

[3] The Eurodollar interest rate is also known as the London Interbank Offered Rate ("LIBOR").

80.     Eurodollar refers to a time deposit denominated in U.S. dollars that is maintained by a bank outside the United States. Payment transactions in the Eurodollar market are not typically settled by the physical transfer of US-denominated banknotes from one counterparty to another. Instead, Eurodollar transactions are settled electronically in New York through a bank owned clearinghouse, and then maintained by book entries of credits and debits in the respective counterparties' accounting system (based on the Society for Worldwide Interbank Financial Telecommunication network ("SWIFT-NET") messages sent between the counterparties and their correspondent banks).

81.     The global Eurodollar market is a wholesale, bank-to-bank market where a correspondent network of banks, bank branches and other bank affiliates outside the United States make loans and accept deposits denominated in U.S. dollars.

82.     According to the Federal Reserve Bank-New York ("FRB-NY"), the Eurodollar market emerged after World War II due to a large increase in U.S. dollars funds circulating outside of the United States from, *inter alia*, the Marshall Plan expenditures to rebuild Europe after the war.

83.     Prior to the launch of SWIFT-NET in 1977, most transactions in the Eurodollar market were conducted electronically by telegraphic transfer ("TELEX").

84.     By the time of the 1979 Iranian Revolution, the Bank of International Settlements ("BIS-Basel") estimated that the size of the Eurodollar market was over $600 billion.

85.     A mid-2015 report by the Bank of International Settlements ("BIS-Basel") estimated that the size of the Eurodollar market by the end of 2014 was over twenty-one *trillion* in USD funds.

86.     As mentioned *supra*, nearly all U.S. dollar transfers initiated through banks outside the United States are processed electronically by correspondent banks in the United States, almost exclusively in New York.

87.     The Clearing House Interbank Payment System ("CHIPS-NY") is a Systematically Important Financial Market Utility ("SIFMU") for the U.S. financial system and the primary provider of clearing and settlement services in USD funds for Eurodollar transactions. CHIPS-NY represents that it processes 95 percent of those Eurodollar funds transfers.

88.     U.S. "dollar clearing and settlement" – primarily (in this case) through the Clearing House Interbank Payments System in New York or "CHIPS-NY" system and the Federal Reserve Bank of New York ("FRB-NY") – is an elaborate inter-bank system in the U.S. by which banks clear and settle credits and debits in their Eurodollar accounts with other banks all across the globe on a daily basis.

89.     The U.S. "dollar clearing and settlement" system is critical not only to the workings of the global economy, but provides financial institutions (and nation states) with critical, essential access to global trade and-finance credit denominated in U.S. dollars.

90.     Thus, once Iran gained clandestine access to the U.S. "dollar clearing and settlement" system in New York, it could launder billions of dollars in funds through its accounts in the Eurodollar market.

91.     During the period relevant to this case (2001-2006), CBI, BSI and BSPLC had access to the Eurodollar market through correspondent banking relationships with a number of western financial institutions, including, *inter alia*, Lloyds TSB Bank Plc ("Lloyds"), Credit Suisse, Commerzbank AG, Standard Chartered Bank ("SCB"), HSBC and Barclays Bank Plc. As

reflected in deferred prosecution agreements and settlement agreements between these banks and U.S. law enforcement, during the relevant period each of these banks provided USD payment processing services to defendants CBI, BSI and/or BSPLC and processed millions of dollars in Iranian transactions through the United States.

92.     According to a January 9, 2009 Deferred Prosecution Agreement between Lloyds and U.S. law enforcement, from 2002 to 2004, Lloyds processed approximately $300 million in outgoing USD payment transactions through U.S. financial institutions on behalf of U.K. Iranian banks, including BSPLC.

93.     According to a December 16, 2009 Settlement Agreement between Credit Suisse and OFAC, from 2003 to 2006, Credit Suisse processed over $480 million in USD electronic funds transfers through U.S. financial institutions for the benefit of Iranian entities, including Iranian financial institutions, in violation of U.S. sanctions.

94.     According to a March 10, 2015 Deferred Prosecution Agreement between Commerzbank and U.S. law enforcement, from 2002 to 2007, Commerzbank processed over $32 million in Iranian payments, including for BSI and BSPLC, through the United States in violation of U.S. sanctions.

95.     According to an October 10, 2012 Deferred Prosecution Agreement between SCB and U.S. law enforcement, from 2003-2006, SCB processed tens of billions of dollars of USD transactions for five Iranian banks, including BSI and BSPLC, through the U.S. financial system, including $7.4 million in violation of U.S. sanctions.

96.     According to a December 11, 2012 Settlement Agreement between HSBC and OFAC, from 2004 to 2010, HSBC processed over $160 million in USD electronic funds transfers

through U.S. financial institutions for the benefit of Iranian entities, including Iranian financial institutions, in violation of U.S. sanctions.

97.     Similarly, the August 16, 2010 Deferred Prosecution Agreement between Barclays and U.S. law enforcement reflects the processing of USD payments for Iranian banks through the U.S. financial system.

98.     Thus, in making the $50 million in transfers of U.S. dollar-denominated funds to Hezbollah, defendants exploited their access to the Eurodollar market through various correspondent banking relationships to orchestrate the transfers in a manner designed to evade detection, scrutiny or monitoring by U.S. regulators, law enforcement and/or depository institutions. By their very nature as U.S. dollar transactions, these transfers were routed through the Eurodollar correspondent banking network for clearance and settlement in the United States. Thus, these transfers were purposefully directed at, and passed through, the United States.

99.     The fact that these funds passed through the U.S. financial system was confirmed by Undersecretary of the Treasury Stuart Levey in his remarks upon the decision to bar BSI (and BSPLC) from carrying out U-Turn transactions. As noted above, in a September 8, 2006 press release, Levey stated: "Bank Saderat facilitates Iran's transfer of hundreds of millions of dollars to Hizballah and other terrorist organizations each year. We will no longer allow a bank like Saderat to do business in the American financial system, ***even indirectly*** . . . " (emphasis added).

**F.      The Hezbollah Rocket Barrage**

100.    Between July 12, 2006 and August 14, 2006, as part of its implementation of Iran's Policy and Goals, Hezbollah fired thousands of rockets and missiles (hereinafter "rocket" or "rockets") at civilians in northern Israel.

101.    The United States repeatedly confirmed that the Hezbollah Rocket Barrage harmed the United States and its national interests. For example, on or about July 17, 2006, then President George W. Bush stated the view of the United States that the Hezbollah Rocket Barrage was being directed at America's friend and ally and must be stopped - "[] it's now clear for all to see that there are terrorist elements who want to destroy our democratic friends and allies, and the world must work to prevent them from doing so."

102.    A few days later, then-President Bush explained the United States' commitment to peace in the region which Iran and Syria were trying to destroy through their terrorist proxy – Hezbollah: "For many years, Syria has been a primary sponsor of Hezbollah and it has helped provide Hezbollah with shipments of Iranian-made weapons…Iran's regime has also repeatedly defied the international community with its ambition for nuclear weapons and aid to terrorist groups. Their actions threaten the entire Middle East and stand in the way of resolving the current crisis and bringing lasting peace to this troubled region."

103.    Bush reiterated these sentiments at an August 7, 2006 press conference during which he stated: "Now, I appreciate people focusing on Syria and Iran, and we should, because Syria and Iran sponsor and promote Hezbollah activities -- all aimed at creating chaos, all aimed at using terror to stop the advance of democracies."

104.    Separately, White House Press Secretary Tony Snow echoed the U.S. position that: "Hizbullah, and also its supporting nations, Iran and Syria, need to understand that we are committed to peace and democracy in the region, and we're not going to back away from it."

105.    Likewise, then-Secretary of State Condoleezza Rice explained the United States interest in creating a new Middle East, stating: "What we're seeing here, in a sense, is the

growing -- the birth pangs of a new Middle East. And whatever we do, we have to be certain that we are pushing forward to the new Middle East, not going back to the old one."

106.    United States interests, of course, are harmed whenever U.S citizens are injured by terrorism. Indeed, Congress has passed legislation giving U.S. citizens private rights of action against those who provide material support to terrorists. *See* 28 U.S.C. § 1605A; 18 U.S.C. § 2333. *See also Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010) ("[T]he Government's interest in combating terrorism is an urgent objective of the highest order.").

107.    The plaintiffs were injured by the Hezbollah Rocket Barrage, as detailed below.

108.    In the summer of 2006, Malka Kumer was a 6-year-old living with her family in the small town of Safed, in the Upper Galilee region of Israel. During that summer she experienced hundreds of terrifying warning sirens followed by rocket strikes and explosions in, or within hearing distance of, Safed. She experienced and vividly recalls that summer as being spent running back and forth between the family home and a bomb shelter, always waiting in terror for the next attack. Those events severely and permanently traumatized Malka, and led directly to serious emotional problems that have afflicted her and disrupted her life ever since. The Hezbollah Rocket Barrage caused Malka severe and lasting psychological and emotional harm.

109.    Chana Liba Kumer, Malka's sister, was a 5-year-old living in Safed with her family in the summer of 2006. She, too, experienced and clearly recalls the sirens and explosions throughout July and August and repeatedly racing to the bomb shelter along with crowds of panicked neighbors. She asked her mother who was firing the rockets and why they wanted to kill her, when she hadn't done anything to them; she remembers her mother telling her that it was "Hezbollah," but being unable or unwilling to explain further. She experienced her friends and

their families leaving Safed for safer places after the rockets started falling, but her family being forced to stay behind, financially unable to leave, and simply praying for protection. She experienced being unable to go outside and play, staying indoors, at home or in a shelter, for over month, and hearing the chilling sounds of the warning sirens and the detonation of rockets. Chana Liba remembers not sleeping in her own room and bed during that period, as the family slept together on mattresses in the safest part of the apartment; and that when the attacks came during Shabbat meals, the entire family huddled together under the dining-room table for protection. All those experiences severely and permanently traumatized her. The Hezbollah Rocket Barrage caused Chana Liba Kumer severe and lasting psychological and emotional harm.

110.    In the summer of 2006, Miriam Almackies was an 18-year-old living in Safed with her three-month-old infant son. Her husband, an Israeli citizen, was away from home during the Hezbollah Rocket Barrage, having been called up to perform military service. Alone with her baby for the duration of the attacks, the 18-year-old Miriam lived in constant terror of death or serious physical injury both for her infant and herself. As a result of the Hezbollah Rocket Barrage, Miriam Almackies experienced horrific trauma, and suffered severe psychological and emotional injuries.

111.    On July 13, 2006, plaintiff Chaim Kaplan was severely injured by a Hezbollah rocket which landed in Safed next to his car. A second rocket struck the Kaplan family's home, narrowly missing Chaim's wife, plaintiff Rivka Kaplan. As a result of these rocket attacks plaintiffs Chaim and Rivka Kaplan suffered severe physical, psychological, and emotional injuries. In separate civil actions against the Islamic Republic of Iran and North Korea, the U.S. District Court for the District of Columbia found that Chaim Kaplan's injuries entitle him to compensation in the amount of $3 million and that Rivka Kaplan's injuries entitle her to

compensation in the amount of $2.5 million. *Kaplan v. Central Bank*, Civ. No. 10-00483 (RCL) ("*Kaplan*") at DE 65.

112.    Plaintiffs Karen and Brian Erdstein resided in Safed at the time of the Hezbollah Rocket Barrage. Numerous rockets landed near the family's home. Karen was pregnant at the time the attacks began and due to the ongoing strain, stress and anxiety, and the rocket explosions near the Erdstein home she suffered a miscarriage and lost the baby. In the wake of the miscarriage, Karen suffered from post-partum depression, damage to her immune system and has developed other medical complications. Brian was greatly traumatized by the rocket attacks and the loss of the baby. In addition, as a result of the rocket attacks and the collapse of tourism in Israel, Brian, a licensed tour guide, lost all of his work and had extreme difficulties supporting his family. The Erdsteins' then-minor daughter, plaintiff Ma'ayan Erdstein suffered emotional and psychological trauma from the Hezbollah Rocket Barrage. Ma'ayan was diagnosed with permanent and severe emotional disorders and receives on-going psychiatric treatment and therapy. As a result of the Hezbollah Rocket Barrage, Brian, Karene and Ma'ayan Erdstein suffered severe physical, psychological, and emotional injuries. The *Kaplan* court found that the injuries suffered by Brian, Karene and Ma'ayan Erdstein entitle them to compensation in the amounts, respectively, of $2.5 million, $3.5 million, and $1.5 million. *Id*. at DE 65.

113.    Plaintiff Chayim Kumer, a resident of Safed, suffered a nervous breakdown and was hospitalized as a result of the Hezbollah Rocket Barrage, which in turn caused severe harm to his wife, plaintiff Nechama Kumer. As a result of the Hezbollah Rocket Barrage plaintiffs Chayim Kumer and Nechama Kumer suffered severe psychological and emotional injuries. The *Kaplan* court found that the injuries suffered by Chayim and Nechama Kumer entitle them to compensation in the amounts, respectively, of $2 million and $2.5 million.

114.     On July 13, 2006 at approximately 7:00 p.m. a rocket launched by Hezbollah landed outside the home of plaintiffs Laurie Rappeport and her then-minor daughter Margalit in Safed. The powerful explosion threw Margalit, who was playing outside on a wall, a distance into the air. Laurie and Margalit suffered severe psychological trauma as a result of this rocket, and the carnage and destruction that they witnessed from other rockets which fell near their home. Ultimately, they fled the city. As a result of the Hezbollah Rocket Barrage Laurie and Margalit Rappeport suffered severe psychological and emotional injuries. The *Kaplan* court found that the injuries suffered by Laurie and Margalit Rappeport entitle them to compensation in the amounts, respectively, of $2.35 million and $1.5 million. *Id*. at DE 65.

115.     In the summer of 2006, plaintiffs Theodore (Ted) Greenberg and Moreen Greenberg were the proprietors of a business in Safed catering to tourists. The Hezbollah Rocket Barrage caused a complete halt in tourism in northern Israel for several months during the peak tourism season, which in turn caused the Greenbergs' business to collapse, which caused them severe emotional distress. Theodore was then compelled to move to Jerusalem to find work, while Moreen remained behind in Safed. The couple also experienced suffered severe psychological trauma as a result of the carnage and destruction that they witnessed. As a result of the Hezbollah Rocket Barrage the Greenbergs suffered severe psychological and emotional injuries.  The *Kaplan* court found that the injuries suffered by Theodore and Moreen Greenberg entitle them to compensation in the amount of $2.5 million each. *Id*. at DE 65.

116.     In the summer of 2006, plaintiff Jared Sauter and his family lived in the town of Rosh Pina in the Galilee, where they had been for several happy years. Shortly after the start of the Hezbollah Rocket Barrage, with rockets raining down on Rosh Pina, Jared and his family fled for their lives in terror to another city. They remained in the home of a relative for the

duration of the attacks, but found it too traumatic and frightening to return to live in Rosh Pina. Jared was forced to relocate his family to a different city, and start over. As a result of the Hezbollah Rocket Barrage, and the trauma and disruption he experienced, Jared Sauter suffered severe psychological and emotional injuries. The *Kaplan* court found that the injuries suffered by Jared Sauter entitle him to compensation in the amount of $1.5 million. *Id*. at DE 65.

117.   In the summer of 2006, plaintiff Dvora Chana Kaszemacher was the proprietor of an art gallery in the city of Safed (a business that caters almost exclusively to tourists). She was also the wife of an elderly Holocaust survivor, and the mother of daughters also living in Safed. The Hezbollah Rocket Barrage caused her severe anxiety and depression, which was exacerbated by her concerns about her husband and daughters. Additionally, the attacks resulted in a complete halt in tourism in northern Israel for several months during the peak tourism season, which in turn caused plaintiff Dvora Chana Kaszemacher severe financial damage. As a result of the Hezbollah Rocket Barrage, Dvora Chana Kaszemacher suffered severe psychological, emotional and financial injuries. The *Kaplan* court found that the injuries suffered by Dvora Chana Kaszemacher entitle her to compensation in the amount of $2,361,966.67. *Id*. at DE 65.

118.   On July 13, 2008, a rocket launched by Hezbollah landed a few meters away from plaintiff Chaya Kaszemacher Alkareif, in Safed causing her psychological and emotional damage. As a result of this rocket attack, and her experience of being in Safed throughout the Hezbollah Rocket Barrage, Chaya Kaszemacher Alkareif suffered severe psychological and emotional damage. The *Kaplan* court found that the injuries suffered by Chaya Kaszemacher Alkareif entitle her to compensation in the amount of $2.25 million. *Id*. at DE 65.

119.   Plaintiffs Avishai Reuvane and Elisheva Aron were living together in Safed in the summer of 2006. Several Hezbollah rockets fell on and severely damaged adjacent homes,

terrorizing them. On July 13, 2006, a rocket fired by Hezbollah struck their home and knocked Avishai unconscious. The couple then fled Safed. As a result of these experiences Avishai Reuvane and Elisheva Aron suffered severe physical, psychological and emotional injuries. The *Kaplan* court found that the injuries suffered by Avishai Reuvane and Elisheva Aron entitle each of them to compensation in the amount of $1.5 million. *Id*. at DE 65.

120.    On July 19, 2006 the art gallery owned by plaintiff Yair Mor in Safed was directly hit by a rocket launched by Hezbollah when he was on the premises. The business was completely destroyed. Rockets also fell near his home in nearby Rosh Pina, and Yair and his family were forced to flee the city for weeks. As a result of these events Yair Mor suffered severe psychological and emotional injuries. The *Kaplan* court found that the injuries suffered by Yair Mor entitle him to compensation in the amount of $850,000. *Id*. at DE 65.

121.    In the summer of 2006, Mikimi Steinberg was living in a rooftop apartment in Safed. When the Hezbollah Rocket Barrage began she was terrified that, given the position of her apartment, she could easily be killed. She therefore fled her apartment for the duration of the attacks. In her absence the apartment was indeed struck and severely damaged by a rocket. Many of her possessions were also destroyed. These experiences caused Mikimi Steinberg severe emotional and psychological injury. The *Kaplan* court found that the injuries suffered by Mikimi Steinberg entitle her to compensation in the amount of $850,000. *Id*. at DE 65.

**G.    Plaintiffs' Injuries Are the Result of Defendants' Conduct**

122.    Hezbollah carried out the Hezbollah Rocket Barrage, thereby causing the injuries and harm suffered by the plaintiffs herein.

123.    Defendants' Transfer of Funds to Hezbollah substantially increased and facilitated Hezbollah's ability to plan, to prepare for and to carry out the Hezbollah Rocket Barrage.

124.     But for Defendants' Transfer of Funds to Hezbollah, Hezbollah's ability (a) to build and maintain its operational infrastructure for the planning and execution of the Hezbollah Rocket Barrage; (b) to pay, train, transport and shelter the terrorist operatives who carried out the Hezbollah Rocket Barrage; and (c) to carry out the Hezbollah Rocket Barrage, would have been severely crippled and limited.

125.     The Hezbollah Rocket Barrage was thereby enabled, facilitated and proximately caused by the conduct of defendants described herein.

126.     Plaintiffs' injuries and harm are therefore the direct and proximate result of defendants' conduct.

**FIRST CLAIM FOR RELIEF**
**AGAINST BOTH DEFENDANTS ON BEHALF OF ALL PLAINTIFFS**
**ACTION FOR INTERNATIONAL TERRORISM PURSUANT TO 18 U.S.C. § 2333(a)**

127.     The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

128.     The actions of defendants BSI and BSPLC described herein constituted "acts of international terrorism" as defined in 18 U.S.C. § 2331.

129.     As required by § 2331, the actions of defendants BSI and BSPLC as described herein constituted a violation of the criminal laws of the United States including, without limitation, the provisions of 18 U.S.C. §§ 2339A, 2339B and 2339C, which criminalize the provision of funding to terrorist organizations and/or for terrorist activities.

130.     As required by § 2331, the actions of defendants BSI and BSPLC were dangerous to human life by their nature and as evidenced by their consequences. At least 43 civilians were murdered by the Hezbollah Rocket Barrage, which was caused and facilitated by the actions of defendants BSI and BSPLC.

131.     As required by § 2331(1)(B) the actions of defendants BSI and BSPLC were "intended ... to intimidate or coerce a civilian population [or] to influence the policy of a government by intimidation or coercion," in that, in furtherance of Iran's Policy and Goals, between 2001 and 2006, BSI and BSPLC provided Hezbollah with over $50 million in financial support with the specific intent and purpose of facilitating, enabling and causing Hezbollah to carry out acts of violence against American and Israeli targets in order to (a) intimidate and influence the United States government and public and thereby weaken, harm and undermine the United States militarily, economically and politically and (b) intimidate and influence the Israeli government and public and thereby bring about the eventual eradication of the State of Israel and its replacement with an Islamic state and the murder and/or expulsion of the Jewish residents of the State of Israel.

132.     As required by § 2331, the actions of defendants BSI and BSPLC transcended national boundaries in terms of the means by which they were accomplished and the persons they appeared intended to intimidate or coerce.

133.     The actions of defendants BSI and BSPLC described herein therefore constitute "acts of international terrorism" as defined in 18 U.S.C. §§ 2331 and 2333(a).

134.     As a direct and proximate result of the actions of defendants BSI and BSPLC the plaintiffs suffered the injuries and harm described herein.

135.     Defendants BSI and BSPLC are therefore liable for all of the damages due to the plaintiffs, in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333(a).

136.     The conduct of defendants was intentional and malicious, and so warrants an award of punitive damages.

## SECOND CLAIM FOR RELIEF
## AGAINST BOTH DEFENDANTS ON BEHALF OF ALL PLAINTIFFS
## AIDING AND ABETTING AND CONSPIRACY PURSUANT TO 18 U.S.C. § 2333(d)

137.     The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

138.     The Hezbollah Rocket Barrage constituted a violation of the criminal laws of the United States, and was dangerous to human life.

139.     The Hezbollah Rocket Barrage appeared to be, and was, "intended ... to intimidate or coerce a civilian population [or] to influence the policy of a government by intimidation or coercion," within the meaning of 18 U.S.C. § 2331(1)(B), in that, since its founding and until July 12, 2006 (and until the present day), Hezbollah has used terrorism against American and Israeli targets in an effort to coerce, intimidate and influence the American and Israeli government and public, and thereby weaken and undermine the United States and bring about the ultimate destruction of the State of Israel and the murder or expulsion of the Jews in Israel.

140.     The Hezbollah Rocket Barrage transcended national boundaries in terms of the means by which it was accomplished and the persons it appeared intended to intimidate or coerce.

141.     Therefore, the Hezbollah Rocket Barrage constituted "acts of international terrorism" as defined in 18 U.S.C. § 2331.

142.     Hezbollah committed, planned, and authorized the Hizbollah Rocket Barrage.

143.     Hezbollah was designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), as of the date on which it committed, planned, and authorized the Hizbollah Rocket Barrage.

144.     Hezbollah is a "person" within the meaning of 18 U.S.C. § 2333(d)(1).

145.    Defendants BSI and BSPLC knowingly aided and abetted Hezbollah to commit the Hezbollah Rocket Barrage, by providing substantial assistance to Hezbollah. Specifically, BSI and BSPLC provided Hezbollah with at least $50 million which they knew would enable, facilitate, support and assist Hezbollah to carry out the acts of terrorism which harmed the plaintiffs.

146.    BSI and BSPLC also engaged in an extensive, long-term criminal scheme with Hezbollah, pursuant to which BSI and BSPLC provided Hezbollah with funds, and wire transfer and other banking services to support Hezbollah's terrorist activities. Pursuant to and in furtherance of that common plan, Hezbollah fired the rockets that harmed the plaintiffs.

147.    Defendants BSI and BSPLC are therefore liable, as aiders and abettors and as co-conspirators, for all of the damages due to the plaintiffs, in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333(a).

### PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs pray that this Court:

(a)    Enter judgment against the defendants jointly and severally in favor of the plaintiffs for compensatory damages in an amount to be determined at trial, but for no less than $50 million, to be trebled pursuant to 18 U.S.C. § 2333;

(b)    Enter judgment against the defendants jointly and severally in favor of the plaintiffs for punitive damages in an amount to be determined at trial;

(c)    Enter judgment against defendants jointly and severally in favor of the plaintiffs for all costs sustained in connection with the prosecution of this action, including attorneys' fees; and

(d)    Grant such other and further relief as justice requires.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues triable by jury.

Dated:    Brooklyn, New York
          December 31, 2018

                              Yours,

                              THE BERKMAN LAW OFFICE, LLC
                              *Attorneys for the Plaintiffs*

                              by:  _____
                                   Robert J. Tolchin

                              111 Livingston Street, Suite 1928
                              Brooklyn, New York 11201
                              (718) 855-3627